IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Docket No. 5: 22-CR-00003 |
| | ) | |
| CHARLES JOSEPH HOOD, | ) | |
| Defendant | ) | |

**MOTION TO SUPPRESS EVIDENCE**

I. **INTRODUCTION**

Defendant, Charles J. Hood requests that this Court suppress all evidence obtained by law enforcement because of his illegal stop and seizure on January 4, 2022, by Officer Tyler Morris and the Harrisonburg Police Department, offering in support:

II. **STATEMENT OF FACTS**

The Harrisonburg Police Department (HPD) responded to a bank robbery at First Citizens Bank on University Boulevard in Harrisonburg, Virginia in the afternoon on January 4, 2022. Employees described a man "dressed in a dark colored jacket, wearing a gator facemask, sunglasses, and a tight-fitting style cap." Video surveillance showed the person wearing a watch cap, dark colored winter style jacket, gray glove, tan work boots with missing laces, and blue jeans. The suspect fled the scene on a bicycle. (USAO 206, attached as Exhibit A.)

1

Shortly after the bank robbery occurred, HPD shared "a description of the suspect" with HPD patrol officers, who began to search the area for the suspect. Via dispatch, an officer initially described the suspect as follows: "he's gonna be on an older style, a curved handle bicycle, possibly wearing a toboggan, darker winter style jacket and dark, possibly jeans, white male, dirty blonde hair." The officer provided the description at 4:00 p.m., about fifteen minutes after the bank robbery. (Bodycam video produced by USAO entitled Axon_Body_3_Video_2022-01-04_1557_X6032663Z.mp4 at 16:00, clip attached as Exhibit B.)[1]

Sometime after the bank robbery, Officer Morris responded to Walmart on Burgess Road near First Citizens Bank to look for the suspect. Around 4:40 p.m., Officer Morris saw a bicycle parked in front of Walmart. He called Officer Seth Luerrson and described the bike as a ten speed. Officer Luerrson asked: "They're like old, curved handlebars?" and Officer Morris said yes. Officer Morris added, "it kind of resembles like a beachy one, if you like quickly look at it real quick, like old curved ones, but if you look at it closely it is like a mountain bike version though." Officer Luerrson instructed Officer Morris to send a photograph of the bike to "Wayne" to confirm whether that bike fit the description. (Bodycam video produced by USAO entitled Axon_Body_3_Video_2022-01-04_1622_X6031229H.mp4 at 16:42, clip attached as Exhibit C.) The bike did not match the

---

[1] Defense counsel filed all audio and video exhibits referenced herein in hard copy with the Clerk's office.

description of the bike shared over the radio. The bike discovered by Officer Morris was a small, blue, aluminum mountain bike with flat bars. That bike was locked with a yellow u-lock to a bicycle rack between Walmart and Home Depot. (USAO 113, attached as Exhibit D.) Officer Morris noticed the bike "really early into the whole thing." But because the bike did not match the beach bike description (he felt "iffy"), he waited before later calling Officer Luerrson to tell him about the bike instead of calling it in on the radio. (Bodycam video produced by USAO entitled Axon_Body_3_Video_2022-01-04_1709_X6031229H.mp4 at 17:09:48, clip attached as Exhibit E.)

A few minutes after the call ended, Officer Morris noticed a tall, white man, who was "extremely sweaty" "talking irate" on his cell phone and "staring at" Officer Morris while walking on a sidewalk along the Home Depot parking lot.[2] Home Depot is next to Walmart, but the sidewalk is along the right side of the Home Depot parking lot, a good distance from the Walmart entrance and the bicycle. Officer Morris was in his patrol vehicle and "wheeled a U-turn" when he saw Mr. Hood. Officer Morris then exited his patrol vehicle to stop and detain Mr. Hood. (See Exhibit F at 16:49:54; Exhibit E at 17:09:32) His body worn camera recorded most of the interaction between Officer Morris and Mr. Hood.

---

[2] Immediately after the police stopped Mr. Hood, Officer Morris told Luerrson that Mr. Hood was "Coming from Walmart, coming from where the bike is parked." See Bodycam video produced by USAO entitled Axon_Body_3_Video_2022-01-04_1622_X6031229H.mp4 at 16:49:54, clip attached as Exhibit F. Later, Officer Morris told Officer Luerrson, Mr. Hood did not "come out of Walmart." (Exhibit E at 17:09:46.)

As Mr. Hood continued to walk away, Officer Morris ordered him to stop. There is a delay before the sound kicks in on the body camera video, so the listener cannot hear Officer Morris initiate contact with Mr. Hood. When the sound cuts on, Officer Morris and Mr. Hood share the following exchange:

*Officer Morris:* "Huh?"

*Charles Hood:* "My wife is having a baby."

*Officer Morris:* "Where at?"

*Charles Hood:* "She's at the hospital now."

*Officer Morris:* "How are you getting there?"

*Charles Hood:* "My buddy's picking me up."

*Officer Morris:* "Hey, come here real quick."

*Charles Hood:* "No."

Officer Morris immediately broadcasted on the radio: "I've got a white male being disorderly with me. He kind of matches the jacket description. We're going through the Texas Longhorn parking lot right now. … He's super sweaty. His jacket is super sweaty. He's like a kind of an older white male, about 40's or 50's." In fact, the jacket Mr. Hood wore did not match the jacket description at all. Mr. Hood wore a gray hoodie with a zipper. The suspect wore a dark colored winter jacket. Mr. Hood's jacket does not appear sweaty in the body camera video. Mr. Hood continued to walk away from Home Depot towards Olive Garden. As Mr. Hood approached Olive Garden, Officer Morris broke into

4

a run. Mr. Hood ran away from Officer Morris and into the road. Several police officers converged on Mr. Hood and ultimately detained him. (Bodycam video produced by USAO entitled Bank Robbery (Bodycam of Stop).mp4, attached as Exhibit G; Bodycam video produced by USAO entitled Axon_Body_3_Video_2022-01-04_1644_X6031132H.mp4, attached as Exhibit H.)

Officer Morris later expressed his concerns about the stop when he told Officer Luerrson, "And I'm like, God, is that enough? Is it just like a local like pan handler, who's not…?" before becoming distracted by another officer photographing evidence. (Exhibit E at 17:10:32)

During a pat down, Officer Morris noticed a "huge bulge in the front of … [Mr. Hood's] pants," and removed a red shirt sleeve with $15,606 inside. (Id., USAO 237, attached as Exhibit I.) During subsequent searches of Mr. Hood's pockets, officers removed sunglasses, cash, pepper spray, a cell phone, an external battery and USB cord, cigarettes, and other miscellaneous items, and later during an interview at the HPD Public Safety Building, officers removed a glove from Mr. Hood's sweatshirt pocket. (USAO 215, attached as Exhibit J.) On January 11, 2022, Detective Jonathan Snoddy obtained a buccal swab from Mr. Hood at the Rockingham Harrisonburg Regional Jail. (USAO 286, attached as Exhibit K.) Mr. Hood made statements to HPD during these encounters. Now, Mr. Hood moves to suppress these, and any other statements obtained,

and items recovered during the investigation as the fruits of the illegal seizure of Mr. Hood.

### III. ARGUMENT

1. <u>The Fourth Amendment Protects Citizens by Prohibiting Unreasonable Searches and Seizures.</u>

The Framers wrote in the Fourth Amendment: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. Amend IV. The Fourth Amendment protects citizens by prohibiting unreasonable searches and seizures.

The Supreme Court has identified three distinct types of police-citizen encounters, each requiring a different level of suspicion to be deemed reasonable under the Fourth Amendment: (1) arrest, which must be supported by probable cause; (2) brief investigatory stops, which must be supported by reasonable articulable suspicion; and (3) brief consensual encounters between police and citizens, which require no objective justification.

On January 4, 2022, Officer Morris seized Mr. Hood when he and other officers physically restrained him in the middle of the road. At the time, no reasonable articulable suspicion existed to support the seizure.

2. <u>Officer Tyler Morris and the Harrisonburg Police Department Seized Charles Hood.</u>

"Generally, for a seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based on probable cause." <u>United States v. Robertson</u>, 305 F.3d 164, 167 (3d Cir. 2002) (citing <u>Katz v. United States</u>, 389 U.S. 347, 356-57 (1967)). Under the exception to the warrant requirement established in <u>Terry v. Ohio</u>, however, an officer may, consisted with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." <u>Terry v. Ohio</u>, 392 U.S. 1 (1968).

A person is seized within the meaning of the Fourth Amendment "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." <u>Terry,</u> 392 U.S. at 19 n.16. Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them *if they are willing to listen*. See, e.g., <u>Florida v. Royer</u>, 460 U.S. 491, 497 (1983) (plurality opinion); see *id.* at 523, n. 3 (Rehnquist, J. dissenting); <u>Florida v. Rodriguez</u>, 469 U.S. 1, 5-6, (1984) (*per curiam*). Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search so long as they do not *induce* cooperation by coercive means. See <u>Florida v. Bostick</u> 501 U.S. 429, 434-435.

Officer Morris and the Harrisonburg Police Department seized Mr. Hood when they physically restrained him after Officer Morris chased him into the street near the Olive Garden. (Exhibit G, Exhibit H) When Mr. Hood politely refused to speak with the police officer, Officer Morris called for backup, chased Mr. Hood, and put his hands on Mr. Hood to force him to engage with the police. (Exhibit G; Exhibit H)

Because law enforcement lacked reasonable suspicion that Mr. Hood was engaged in criminal activity when they pursued him and grappled him to a standstill, any "evidence" found on, or statements made by Mr. Hood are the fruits of an illegal seizure and must be suppressed.

3. <u>Officer Morris and the Harrisonburg Police Department seized Mr. Hood without first establishing "reasonable articulable suspicion" that Mr. Hood was or had been engaged in criminal conduct.</u>

Before an officer may validly seize or detain a person, reasonable suspicion must exist that the person is engaged in criminal conduct. <u>United States v. Mayo</u>, 361 F.3d 802, 806 (4th Cir. 2004); <u>United States v. Swindle</u>, 407 F. 3d 562, 567-568 (2nd Cir. 2005) ("[A] police officer should not be empowered to order someone to stop unless the officer reasonably suspects the person of being engaged in illegal activity. We find this position most faithful to <u>Terry's</u> own prescription that when stopping a suspect, a police officer's action be justified at its inception."" citing <u>Terry</u>, 392 U.S. at 20). "While reasonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires

8

at least a minimal level of objective justification before making the stop. The officer must be able to articulate more than an 'inchoate and unparticularized suspicion or hunch of criminal activity." Illinois v. Wardlow, 528 U.S. 119 (2000) (internal citations omitted). "Any evidence obtained pursuant to an investigatory stop … that does not meet this exception must be suppressed as 'fruit of the poisonous tree." United States v. Brown, 448 F.3d 239 at 244 (3d Cir. 2006).

An officer demonstrates reasonable suspicion when he can "point to specific and articulable facts which, taken together with rational inferences from those facts, evince more than an inchoate and unparticularized suspicion or hunch of criminal activity." An "inchoate and unparticularized hunch" is insufficient. United States v. Branch, 537 F.3d 328, 336 (4th Cir. 2008) (quoting Terry, 392 U.S. at 27). Reasonable suspicion is an objective standard – an officer's subjective beliefs are not relevant. United States v. Powell, 666 F.3d 180, 186 (4th Cir. 2011). The "Government must do more than simply label a behavior as 'suspicious' to make it so." United States v. Foster, 634 F.3d 243, 246 (4th Cir. 2011). Similarly, while factors consistent with innocent activity can, when considered together, give rise to reasonable suspicion, "[t]he articulated factors together must serve to eliminate a substantial portion of innocent travelers before the requirement of reasonable suspicion will be satisfied." United States v. Foreman, 369 F.3d 776, 781 (4th Cir. 2004).

Neither Mr. Hood's appearance, nor his actions, nor his unwillingness to engage with Officer Morris gave rise to reasonable suspicion. Officer Morris observed Mr. Hood

9

walking near the Home Depot in a shopping center about a mile from the bank where the robbery occurred almost an hour after the robbery. The shopping center hosts a number of businesses including Home Depot, Walmart, Best Buy, Petco, Staples, Michaels, Bed Bath & Beyond, Barnes and Noble, and several smaller businesses. Judging from the number of cars in the parking lot, other individuals were out and about at the time—a Tuesday afternoon. Officer Morris stopped Mr. Hood because he "kind of" matched the description – he was an older white male with light colored hair and because he was sweaty and talking animatedly on his phone. None of these characteristics points to wrongdoing. There is no reason why the person who robbed the bank would have been sweaty nearly an hour after the robbery less than a mile from where the incident occurred. Had Officer Morris observed Mr. Hood several miles from the bank, he could have articulated that a person who traveled several miles from the bank within an hour might have been sweaty on a cold day. But, had Mr. Hood robbed the bank, he would not have been sweaty almost an hour later after riding a bike less than a mile in the winter. Officer Morris also stopped Mr. Hood because he was allegedly "irate" on his phone outside the Home Depot. But there is no reason to believe the person who robbed the bank would be talking on his phone irately. In other words, the fact that Mr. Morris believed Mr. Hood appeared sweaty and observed him talking in a particular manner on his phone did not establish any suspicion Mr. Hood participated in the robbery, whether or not Officer Morris claims it did. Other than being a white male with light colored hair wearing jeans,

10

Mr. Hood did not match the description of the robber. The robber wore a "toboggan," a "dark colored" "winter style" jacket, and work boots. Mr. Hood wore a ball cap, gray hooded sweatshirt, and gray slip-on sneakers. Officer Morris ignored the description broadcast over the radio when he stopped Mr. Hood.

The bank robber rode away on a bicycle with curved handles. Mr. Hood was not seen on a bicycle and there is no reason to believe the mountain bike locked outside the Home Depot belonged to Mr. Hood. Officer Morris observed the bicycle "really early into the whole thing," before he noticed Mr. Hood. He never saw Mr. Hood on a bicycle, let alone that bicycle. In fact, he saw Mr. Hood <u>walking</u> away from the shopping center where he noticed the locked bicycle. Mr. Hood did not "kind of" match the jacket description. He wore a gray hoodie. The robber wore a "dark colored" "winter stye," jacket. Mr. Hood wore gray sneakers. The robber wore work boots. Mr. Hood wore a ball cap. The robber wore a winter cap.

Officer Morris stopped Mr. Hood on a hunch. He rightfully questioned whether his feeling would hold up against the Fourth Amendment when he told a senior officer what went through his head when he stopped Mr. Hood: And I'm like, God, is that enough? Is it just like a local like pan handler, who's not…?" (Exhibit E at 17:10:32) Officer Morris should have eliminated Mr. Hood from any group of suspects because he did not match the description in any meaningful way and his actions did not create reasonable

11

suspicion. His hunch, right or not, is not sufficient under the Fourth Amendment to justify the deprivation of Mr. Hood's liberty.

### i. A refusal to engage with a police officer is not a source of reasonable suspicion.

Refusal to consent to a Terry stop is not a source of reasonable suspicion that a person was engaged in a crime. The Supreme Court held in Bostick, that that such refusal "'does not furnish the minimal level of objective justification needed for a detention or seizure.'" Bostick, 501 U.S. at 437. As the Court recognized in Royer, 460 U.S. at 497-98, "[t]he person approached . . . need not answer any question put to him; indeed, he may decline to listen to the questions at all *and may go on his way*," (emphasis added). In other words, a citizen may refuse an officer's questions. Therefore, Mr. Hood's unwillingness to talk to Officer Morris does not create any degree of suspicion either.

Mr. Hood's "flight" does not create reasonable suspicion either. While the Court has recognized that *unprovoked, headlong* flight "upon noticing the police" in "an area of heavy narcotics trafficking" *may* amount to "reasonable suspicion" and justify a Terry stop, the Court explicitly distinguished the situation in Royer. Wardlow, 528 U.S. at 124-25. "Unprovoked flight is simply not a mere refusal to cooperate. Flight, by its very nature, is not 'going about one's business.'" *Id.* For example, in United States v. Marcelino, 736 F. Supp. 2d 1343, 1350-52 (N.D. Ga. 2010), the court rejected the government's contention that the defendant fled, when he and his companion continued walking, albeit at a faster pace, after agents addressed them. "To hold differently would

12

render the concept of a voluntary or consensual stop meaningless because a person would never have the right to continue about their business without creating reasonable suspicion." Id. at 1351.

Here, Mr. Hood merely continued on his path away from the Home Depot parking lot. He only ran when the officer began to chase him. A reasonable person would run when chased, even by a person who appeared to be a police officer. Mr. Hood did not want to interact with the police that day and he was not required to do so.

Courts have recognized that *provoked* flight does not contribute to the reasonable suspicion analysis. In United States v. Franklin, the Eleventh Circuit recognized that while all flight is, in a sense, provoked by law enforcement, officers could not improperly provoke flight in a suspect and then use that flight as the basis for a detention or arrest. United States v. Franklin, 323 F.3d 1298, 1302 (11th Cir. 2003) (citing Wong Sung v. United States, 371 U.S. 471 (1963). See also Marshall ex rel. Gossens v. Teske, 284 F.3d 765, 771 (7th Cir. 2002) (noting that "it's doubtful that the officers even had reasonable suspicion to stop Marshall, given that his flight was not 'unprovoked,'" where he was pursued by masked, armed plainclothes officers). The evaluation of what constitutes improper provocation is, as courts have recognized, not well developed, but it includes at least the use of fraud or placing the subject in reasonable fear of harm. United States v. Jeter, 721 F.3d 746, 754 (6th Cir. 2013). The test applied by the Eleventh Circuit is whether a reasonable, innocent person would have fled in the same manner as the defendant.

13

Franklin, 323 F.3d at 1302. Mr. Hood was walking on the sidewalk near the Home Depot towards Texas Roadhouse. His decision to continue walking does not amount to flight from the police. Here, Mr. Hood merely declined to speak to Officer Morris, and, in spite of his refusal, Officer Morris pursued and chased him. Officer Morris' unconstitutional pursuit and ultimate chase *provoked* Mr. Hood's ultimate flight immediately before his seizure.

      ii.    <u>Nervous or unusual behavior, standing on its own, does not give rise to reasonable suspicion.</u>

"Unusually nervous behavior," such as, "shaking hands, heavy breathing, and providing inconsistent answers'" may add to an objective assessment of reasonable suspicion, but it does not provide a sufficient basis for a seizure. <u>United States v. Massenburg</u>, 654 F.3d 480, 490 (4th Cir. 2011). As the Fourth Circuit has recognized, "it is important not to overplay a suspect's nervous behavior in situations where citizens would normally be expected to be upset." <u>United States v. Glover</u>, 662 F.3d 694, 699 (4th Cir. 2011); see also <u>Massenburg</u>, 654 F.3d at 490 ("It is common for most people to exhibit signs of nervousness when confronted by a law enforcement officer whether or not the person is currently engaged in criminal activity.") This is especially true in a context like this one, where the proffered explanation—a wife in labor—is a classic cause of anxiety and high emotion. Similarly, the Fourth Amendment stands in the way of the police arresting people simply because they appear suspicious and may be hiding something. <u>United States v. Gibson</u>, 19 F.3d 1449, 1452 (D.C. Cir. 1994).

14

A sweaty jacket and angry tone on the phone are not suspicious. Officer Morris does not claim Mr. Hood *began* to sweat when he noticed the police. He alleges Mr. Hood was "extremely sweaty" when he saw him on the sidewalk. Similarly, an irate phone call does not indicate that a person has recently committed a bank robbery. People may sound upset for innumerable reasons – they are arguing with a partner, frustrated with a cable company, or angry that a ride did not show up as promised. Mr. Hood's alleged glance at Officer Morris during a frustrated conversation does not suggest he is hiding something. It is not unusual for a police car to catch a person's attention. Mr. Hood did not exhibit any "unusually nervous behavior" and, if he had, it would not be sufficient to establish reasonable suspicion, even in combination with his skin and hair colors.

      iii.    <u>Police lack reasonable suspicion where the person seized does not match the suspect's description.</u>

Courts have granted motions to suppress where the person or vehicle seized does not match the description of the suspect or vehicle sought. <u>See</u>, <u>e.g.</u>, <u>United States v. Jackson</u>, 188 F. App'x 403, 409-12 (6th Cir. July 20, 2006) (granting suppression where the car stopped was a green Dodge Neon driven by a short-haired black man in a black tee shirt, and the car sought was a green BMW driven by a bald black man in a white or grey tee shirt). While one discrepancy between a suspect's description and an individual's appearance may not vitiate reasonable suspicion. See <u>United States v. Slater</u>, 979 F.3d 626, 632 (8th Cir. 2020), multiple discrepancies are not so easily brushed aside.

Similarly, a description so vague as to be ubiquitous, without more, is insufficient to support reasonable suspicion. United States v. Foster, 891 F.3d 93 (3d Cir. 2018). The court recognized that "an excessively general description ... in the absence of corroborating observations by the police [ ] does not constitute reasonable suspicion." Brown, 448 F.3d at 252; see also, e.g., United States v. Arthur, 764 F.3d 92, 99 (1st Cir. 2014) ("Let us be perfectly clear. Ubiquitous or vague physical descriptions ... , without more, are not enough to support reasonable suspicion."); United States v. Bailey, 743 F.3d 322, 349 (2d Cir. 2014) ("[G]eneric descriptions of race, gender, and build, without more, have been held insufficient to justify reasonable suspicion."). In Goodson v. City of Corpus Christi, 202 F.3d 730, 737 (5th Cir. 2000), the Fifth Circuit recognized, in a section 1983 action, that the description of the suspect as a "white male, approximately six feet tall, heavy-set, and dressed like a cowboy, possibly heading to a cowboy bar" was "simply too vague, and fit too many people, to constitute particular, articulable facts on which to base reasonable suspicion."

The description or, rather, the features of the broadcasted description shared by Mr. Hood – white male with dirty blond hair—were even less specific. And courts have recognized that race and gender, standing alone and sometimes even in tandem with other factors, do not generate reasonable suspicion for a stop. See, e.g., Swindle, 407 F.3d at 769-70 (finding no reasonable suspicion for a traffic stop when the only characteristics the defendant shared with the suspect was that he was a Black male). See also Whren v.

United States, 517 U.S. 806 at 810 (1966) (referring to race as a "decidedly impermissible factor [ ]" on which to exclusively base a stop); United States v. Brignoni–Ponce, 422 U.S. 873, 885–87 (1975) (holding that apparent Mexican ancestry of car occupants did not justify stop based on suspicion that they were illegal aliens); Brown v. City of Oneonta, New York, 221 F.3d 329, 334 (2d Cir. 2000) (allowing plaintiffs to proceed with their Fourth Amendment claims in 42 U.S.C. § 1983 suit against city because plaintiffs were apparently seized on account of race, and "a description of race and gender alone will rarely provide reasonable suspicion justifying a police search or seizure"); United States v. Montero–Camargo, 208 F.3d 1122, 1135 (9th Cir. 2000) (en banc) ("Hispanic appearance is, in general, of such little probative value that it may not be considered as a relevant factor where particularized or individualized suspicion is required."); United States v. Roberson, 90 F.3d 75 (3d Cir. 1996) (finding no reasonable suspicion to conduct investigatory stop where police relied solely on anonymous tip identifying black man in certain attire and location as drug dealer, and where police officers observed no behavior justifying stop); United States v. Rias, 524 F.2d 118, 121 (5th Cir. 1975) (finding no reasonable suspicion for stopping two black men driving a Chevrolet where sole justification for stop was fact that men fitting that description were suspects in robbery that occurred two to four weeks before stop). While this issue typically arises when police stop a black or brown person, it is just as applicable when police stop a white man based on his skin and hair color.

17

Here, Officer Morris did not even articulate that he stopped Mr. Hood because he was a white male with dirty blonde hair. Instead, he claimed he stopped Mr. Hood because he was sweaty, talking irately on his phone in a large shopping center, and allegedly "kind of" matched the jacket description. An Officer's claim that someone matched the description is not sufficient – the suspect must *actually* match the description. A gray hooded sweatshirt with a zipper is not remotely similar to a dark colored winter jacket.

Had Officer Morris reported he stopped Mr. Hood because he was a white male with dirty blonde hair like the suspect, he would still not be justified. According to the United States Census Bureau, in 2021, more than sixty five percent of the population in Harrisonburg, Virginia was white, excluding Hispanic and Latino residents. More than fifty one percent of the population is female, so roughly half the population is male.[3] In 2021, more than 51,000 people lived in the city of Harrisonburg. To be a sweaty, white, male talking irately on a phone in a such a city is simply not sufficient to justify a stop while investigating this bank robbery – where police offered a much more detailed description of the robber.[4]

---

[3] QuickFacts Harrisonburg city, Virginia, United States Census Bureau, https://www.census.gov/quickfacts/fact/table/harrisonburgcityvirginia/RHI125220#RHI125220 (Accessed June 13, 2022).

[4] When Officer Morris stopped Mr. Hood, the police had not found the discarded clothing behind the Walmart or the boots in the Walmart bathroom trash can. So, they had no evidence or reason to believe the suspect discarded or changed any clothing. The

18

## IV.     CONCLUSION

On January 4, 2022, Officer Morris and the Harrisonburg Police Department seized Mr. Hood in violation of the Fourth Amendment. Mr. Hood, walking on the sidewalk near Home Depot, did not match the description of the suspect in any meaningful way. In fact, his clothing and shoes distinguished him from the suspect. The allegation that he was sweaty and talking irately on his phone did not generate any reasonable articulable suspicion that an hour prior he committed a bank robbery less than a mile away. Nor did his unwillingness to stop what he was doing and talk to Officer Morris give rise to reasonable suspicion. Officer Morris stopped and seized Mr. Hood on a hunch. This Court must suppress any evidence found on Mr. Hood by the Harrisonburg Police Department and his subsequent statements because they are the fruit of the unconstitutional seizure of Mr. Hood.

---

police did not suggest when describing the suspect that he could be wearing anything other than what the victims described. (See Dispatch Recording produced by USAO entitled Start Time=01_04_2022 15_53_44.wav, attached as Exhibit L.)

        Respectfully submitted,

        /s/Abigail M. Thibeault
        Assistant Federal Public Defender
        Maryland Atty ID 1803010004

        Abigail M. Thibeault
        Assistant Federal Public Defender
        Office of the Federal Public Defender
        401 E. Market Street, Suite 106
        Charlottesville, VA 22902
        Ph. (434)220-3388
        Fax (434)220-3390
        abigail_thibeault@fd.org

        /s/Erin M. Trodden
        Assistant Federal Public Defender

        Erin M. Trodden
        Assistant Federal Public Defender
        Office of the Federal Public Defender
        401 E. Market Street, Suite 106
        Ph. (434)220-3396
        Fax (434)220-3390
        erin_trodden@fd.org

## CERTIFICATE OF SERVICE

      I hereby certify that on June 16, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to counsel of record.

        /s/Abigail M. Thibeault
        Assistant Federal Public Defender